IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CONFEDERATED SALISH AND KOOTENAI TRIBES,<br><br>Plaintiff,<br><br>vs.<br><br>LAKE COUNTY BOARD OF COMMISSIONERS; and LORI LUNDEEN,<br><br>Defendants. | CV 19–90–M–DLC<br><br>ORDER |

Before the Court are Plaintiffs Confederated Salish and Kootenai Tribes' Motions to Dismiss the Counterclaims of Defendants Lori Lundeen and Lake County Board of Commissioners ("Lake County"). (Docs. 32 & 51.)[1] The Tribes seek dismissal of the Defendants' counterclaims for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1). Although it notes that the practical effect of this Order is limited, the Court grants the motions and dismisses the Defendants' counterclaims in full.

---

[1] The Tribes first moved for dismissal of Lake County's and Lundeen's counterclaims on July 8, 2019. (Doc. 32.) Lake County amended its counterclaims on July 29, 2019, mooting the Tribes' first motion as to Lake County. (Doc. 39.) The Tribes filed a renewed motion on August 19, 2019, incorporating much of the substantive analysis found in its first motion to dismiss. (Doc. 51.) Then, on September 19, 2019, the Tribes filed an amended complaint, necessitating the filing of a new answer, which incorporates by reference the earlier counterclaims. (Doc. 62.) Lake County has represented that the Tribes need not file a third motion to dismiss, and the Court, like the parties, construes the second motion (Doc. 51) as if it had been filed in response to the operative counterclaims.

1

## BACKGROUND[2]

The Confederated Salish and Kootenai Tribes are a federally recognized confederation of Indian tribes that once occupied what is now western Montana and parts of Idaho, Wyoming, and British Columbia. Today, the Tribes are headquartered in the Flathead Indian Reservation, which encompasses 1.3 million acres of western Montana, extending north of Missoula through the lower half of Flathead Lake. *See* Hell Gate Treaty of 1855, July 16, 1855, 12 Stat. 975, 1855 WL 10416 ("Commencing at the source of the main branch of the Jocko River; thence along the divide separating the waters flowing into the Bitter Root River from those flowing into the Jocko to a point on Clarke's Fork between the Camash and Horse Prairies; thence northerly to, and along the divide bounding on the west the Flathead River, to a point due west from the point half way in latitude between the northern and southern extremities of the Flathead Lake; thence on a due east course to the divide whence the Crow, the Prune, the So-ni-el-em and the Jocko Rivers take their rise, and thence southerly along said divide to the place of beginning.").

Under the Hell Gate Treaty, signed in 1855, the United States agreed that the Reservation would be "set apart . . . for the exclusive use and benefit" of the

---

[2] At this stage of the proceeding, the factual and legal background provide context but are largely irrelevant to the analysis. The facts presented in this Order are in no way binding as to any future disputes.

2

Tribes. Hell Gate Treaty art. II. Non-Indian settlers could reside within the Reservation's boundaries only with the Tribes' permission. *Id.* And the Tribes agreed to relinquish their claim to their historic territories, allowing "all citizens of the United States to enter upon and occupy as settlers any lands not actually occupied and cultivated by said Indians at this time, and not included in the [Reservation]." *Id.* Particularly relevant in this litigation, the Hell Gate Treaty provides: "That if necessary for the public convenience roads may be run through the said reservation; and, on the other hand, the right of way with free access from the same to the nearest public highway is secured to them, as also the right in common with citizens of the United States to travel upon all public highways." *Id.* art. III.

In 1904, Congress passed the Flathead Allotment Act, which forced the allotment of Reservation lands to individual Indians. Act of April 23, 1904, Pub. Law No. 58-159, 33 Stat. 302 (1904). The 1904 Act provided that unallotted agricultural and grazing lands would be distributed to non-Indians by presidential proclamation following a survey of the Reservation. *Id.* The United States would "act as trustee for . . . Indians" in opening up the Reservation for non-Indian settlement and collecting and expending any revenues received from the sale of land. *Id.* at 305–06. The Act authorized the platting of specific town sites and delegated authority to the Secretary of the Interior to plat other as-yet

3

undetermined town sites within the Reservation. Act of Feb. 27, 1906, Pub. L. No. 59-258 § 17, 34 Stat. 325, 354 (1906).

President Taft issued the ensuing proclamation on May 22, 1909, opening up parts of the Reservation for settlement by interested non-Indians. Proclamation of May 22, 2009, 36 Stat. 2494. Following the Act and presidential proclamation, in 1910 the U.S. General Lands Office ordered a plat for the Big Arm town site in anticipation of non-Indian settlement. (Doc. 43 at 3.) Approved in 1913, the plat encompasses 206.66 acres of Reservation land bordering the southwest shore of Flathead Lake. (Doc. 43 at 3; 1-1.) Big Arm was never incorporated as a town, and the actual development of the land does not correspond closely to the 1913 plat. (Doc. 43 at 4.) In 1956, in recognition of the lack of interest in non-Indian settlement, the Department of the Interior gave notice that much of Big Arm would be "restored to tribal ownership." Notice: Restoring Lands to Tribal Ownership, 21 Fed. Reg. 6681–82 (Sept. 5, 1956).

The present dispute relates to a small parcel of land within the Big Arm town site. Defendant Lori Lundeen owns 40 acres of land bordering Big Arm, which she is developing as an RV resort. (Doc. 43 at 2.) Lundeen began developing a road through Big Arm to access her property. She has asserted that no other access route is feasible. At issue is her right to develop and use this road.

In early 2018, Lundeen applied for a permit for her proposed development to Lake County. (Doc. 43 at 4.) At a Lake County Board of Commissioners meeting held on April 11, 2018, the Tribes' representative to the Board raised concerns about Lundeen's ability to access the property, as no developed road reached Lundeen's acreage. (Doc. 43 at 4.) Her concerns were echoed by a Big Arm resident attending the meeting. (Doc. 1-5.) The Board recognized that there was not a developed road leading to the property and noted that the proposed access road would run through the Big Arm town site in rough alignment with the roads proposed in the 1913 plat. (Doc. 1-5.) According to the minutes of the meeting, "The situation [regarding the road] was discussed further, and people agreed it was messy." (Doc. 1-5 at 7.) Despite the concerns raised at the meeting, the Board voted 7 to 3 in favor of recommending preliminary approval of the subdivision. (Doc. 1-5 at 8.)

Lundeen quickly began to plan for and advertise the resort. (Doc. 16 at 10.) The Lake County Board of Commissioners issued its conditional approval of Lundeen's Wild Horse RV Resort Subdivision on May 16, 2018. (Doc. 43 at 5.) The final subdivision plat was to be recorded only after: (1) Lundeen and the County's Planning Department investigated legal access; and (2) Lundeen confirmed that the county considered access to be legal. (Doc. 43 at 5; Doc. 1–6.)

On May 13, 2019, the Tribes placed a gate at the end of the developed road Lundeen had been using to access the emerging road and her property. (Doc. 43 at 5.) The Bureau of Indian Affairs issued a notice of trespass to the construction company hired by Lundeen to make improvements to the property. It reads:

> This letter is to notify you that we have determined you are trespassing on Indian trust land. . . .
>
> On April 16, 2019 the Tribal Lands Department inspected and took photos of heavy equipment in the Big Arm Townsite, Blocks 15, 16, 18, 29 & 30, located in Section 33, Township 24 North, Range 21 West, P.M.M., Flathead Reservation, USA.
>
> While inspecting the area on May 13, 2019, the Field Technician additionally observed heavy equipment constructing and improving a new road on tribal trust lands in Blocks 15, 16, 18, 29 & 30 of the Big Arm Townsite, a portion of tribal tract T 6001, without a valid grant of easement for right of way granting you use of this property.
>
> You must immediately cease your use of tribal tract T 6001. Additionally, we will soon send you a notice assessing you damages for the use of this property.[3] If you do not immediately cease your use of the land, damages and costs may increase. We will also refuse to issue you a permit or lease for the use, development, or occupancy of other Indian lands until the matter of trespass is resolved. . . .

(Doc. 1-15.)

The Tribes brought suit shortly thereafter, on May 24, 2019. The parties have since stipulated that, pending disposition of this matter, the Tribes will remove or unlock the gate and Lundeen will not further develop the land in

---

[3] It is unclear at this stage of litigation whether any damages were assessed or further notice sent.

6

question. (Doc. 35-2.) (Of course, Lundeen remains free to develop her own property.)

## LEGAL STANDARD

The Tribes seek dismissal of the County's and Lundeen's counterclaims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Rule 12(b)(1) authorizes dismissal of a claim for lack of subject matter jurisdiction, while 12(b)(6) governs dismissal for failure to state a claim upon which relief may be granted.

"Rule 12(b)(1) jurisdictional attacks can be either facial or factual." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). "A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.'" *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)). "With a factual 12(b)(1) attack, however, a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment." *White*, 227 F.3d at 1242. "It . . . need not presume the truthfulness of the plaintiffs' allegations." *Id.*

The standard to resolve a motion brought under Rule 12(b)(6) mirrors that applicable to a facial attack brought under 12(b)(1). *Leite*, 749 F.3d at 1121. The Court accepts as true the factual allegations of the counterclaim and determines

whether the counterclaim "contain[s] sufficient factual matter . . . to 'state a claim to relief that is probable on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). That said, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*

Here, the Tribes' motion raises only facial challenges to the County's and Lundeen's counterclaims, and so the Court accepts as true the factual allegations of the counterclaims. However, because the disputed issues are legal and not factual, the County's and Lundeen's allegations are not particularly relevant to the Court's disposition of the motion to dismiss their counterclaims. Additionally, although the Tribes cite Rule 12(b)(6) in support of their motion (*see* Doc. 52 at 2), they present no argument supporting dismissal for failure to state a claim, and the Court accordingly address only the issue of jurisdiction.

## DISCUSSION

The Tribes assert that this Court has original jurisdiction over its claims pursuant to 28 U.S.C. §§ 1331 & 1362. It seeks "[j]udgment quieting [the Tribes'] beneficial interest to the real property, including streets, alleys, and public reserves (held in trust by the United States for the benefit of the [Tribes]) in the Big Arm Townsite, and determining that Defendants have no right, title, or interest in or to the real property or any public right of way." (Doc. 60 at 13.)

8

The Defendants seek similar relief. Lake County asks for: (1) a declaration "that [the Tribes] ha[ve] no right, title, or interest in or to the real property at issue"; (2) a declaration of quiet title "to all streets, alleys and public reserves located in the Big Arm Townsite reflecting the interests of Lake County and any other parties of interest"; (3) an injunction barring the Tribes from breaching the stipulation; (4) a permanent injunction "enjoining [the Tribes] from trespassing or regulating the use of roads and alleys within the Big Arm Townsite"; and (5) "[s]uch other relief is just and proper." (Docs. 39 & 61.) Similarly, Lundeen requests: (1) quiet title "to all streets, alleys, and public reserves located in the Big Arm Townsite reflecting the interests of Lake County and Ms. Lundeen, as well as the public at large"; (2) an injunction barring "[the Tribes] during the pendency of this case from restricting access to her property over and through the streets alleys, and public reserves located in the Big Arm Townsite"; (3) an order that the Tribes "immediately remove the locked gate placed on E Street and refrain from erecting any other obstruction or otherwise obstructing public access or person's access to their property or homes"; and (4) "[s]uch other relief as this Honorable Court deems just and proper." (Doc. 16.) The parties' stipulation addresses the immediate relief requested by Lundeen.

The Tribes claim that sovereign immunity bars the County's and Lundeen's counterclaims and that the Court accordingly may not exercise jurisdiction over

those claims. "Sovereign immunity limits a federal court's subject matter jurisdiction over actions brought against a sovereign." *Alvarado v. Table Mountain Rancheria*, 509 F.3d 1008, 1015–16 (9th Cir. 2007). Tribes are "domestic dependent nations that exercise inherent sovereign authority," *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014), and they accordingly "possess[] the common-law immunity from suit traditionally enjoyed by sovereign powers," *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978).

The County argues that the Tribes "ha[ve] waived any sovereign immunity by, among other actions, filing the Complaint, by committing a depredation by provision of Article 11 of the Lame Bull Treaty, October 17, 1855, 11 Stat. 657, and Article 8 of the . . . Treaty of Hell Gate, July 16, 1855, 12 Stat. 975. (Doc. 39 at 3; *accord* Doc. 56 at 6.) Lundeen echoes the County's waiver argument and contends that her counterclaim may survive for an additional reason, that it sounds in recoupment. (Doc. 41 at 13.)

## I. Waiver by Treaty

The Court is skeptical of the Defendants' arguments that the Tribes waived sovereign immunity as to their counterclaims through the Hell Gate and Lame Bull Treaties. As a preliminary matter, the County and Lundeen are not parties to those treaties. Moreover, the relevant promises made in the treaties—"to be friendly with [United States] citizens," Lame Bull Treaty art. XI, Oct. 17, 1855, 11 Stat.

10

657; Hell Gate Treaty art. VIII, and to "make reparations[] for depredations,"[4] Lame Bull Treaty art. XI—come nowhere near the "unequival[] express[ion]" required to find a waiver of sovereign immunity. *Santa Clara Pueblo*, 436 U.S. at 58 (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)). Closer, perhaps, are the provisions addressing travel through the Reservation. Hell Gate Treaty art. III; Lame Bull Treaty art. VII. But, while interpretation of these latter provisions will likely prove essential to ultimately resolving the issue of title, they cannot be understood to waive sovereign immunity.

## II.     Recoupment

The Court is similarly unconvinced by Lundeen's argument that her counterclaim sounds in recoupment. "[C]laims arising out of the same transaction or occurrence and sounding in recoupment can be sustained as counterclaims against a tribe." *Quinault Indian Nation v. Pearson ex rel. Estate of Comenout*, 868 F.3d 1093, 1100 (9th Cir. 2017). The County's and Lundeen's counterclaims

---

[4] The parties do not explore the meaning of "depredations"; the Defendants merely assert that the Tribes have committed a depredation by claiming title to the land through which the Defendants would like to place a road. The Court notes that "depredation" appears to have a specific meaning rooted in historical conflict between indigenous peoples and white settlers, and this meaning does not easily encompass issuing a notice of trespass. *See Depredation, Black's Law Dictionary* (11th ed. 2019) (defining "depredation" as "[a]n act of taking or destroying something; esp., a plundering and pillaging"); *accord Herring v. United States*, 32 Ct. Cl. 536 (1897) (describing bands of "depredating Indians" as those who, for example, engaged in "the theft of stock, the burning of houses, and the killing of many of the [white] settlers"); *Jaeger v. United States*, 33 Ct. Cl. 214 (1898) (describing "the act of a careless servant" as "not . . . a depredation" when it did not involve "the plundering, despoiling, or pillaging of members of a band of Indians . . . .").

11

arise out of the same transaction or occurrence as the Tribes' claims. However, "recoupment claims must be monetary, not injunctive or declaratory." *Id.* Because Lundeen has not requested monetary damages, the doctrine of recoupment is inapplicable.[5]

### III. Waiver by Initiating Suit

Determining whether the Tribes effectuated a limited waiver of tribal immunity by filing this lawsuit presents a closer call. "Initiation of a lawsuit necessarily establishes consent to the court's adjudication of the merits of that particular controversy." *McClendon v. United States*, 885 F.2d 627, 630 (9th Cir, 1989). Thus, where a tribe initiates a lawsuit to establish title to specific lands, "the [t]ribe accept[s] the risk that it [will] be bound by an adverse determination of ownership of the disputed land." *Id.*

That said, "a tribe's participation in litigation does not constitute consent to counterclaims asserted by the defendants in those actions." *Id.* "[A] tribe's initiation of a lawsuit for injunctive relief does not waive its immunity to

---

[5] Lundeen cites to an Eastern District of Wisconsin case to suggest that recoupment can save a counterclaim for injunctive relief. *Oneida Tribe of Indians of Wis. v. Vill. of Hobart*, 500 F. Supp. 2d 1143, 1146–50 (E.D. Wis. June 22, 2007). Setting aside the Ninth Circuit's clear holding to the contrary, *Quinault Indian Nation*, 868 F.3d at 1100, *Oneida Tribe* does not hold the meaning Lundeen attributes to it. In *Oneida Tribe*, the district court did not apply the doctrine of recoupment but instead found that the tribe in that case waived tribal immunity to mirror-image counterclaims. *Oneida Tribe*, 500 F. Supp. 2d at 1150 ("By invoking the jurisdiction of the Court to determine the rights of the respective parties over the land in question, the Tribe has expressly waived its immunity from the Village's claim for a determination in its favor on the same issue.").

12

counterclaims, including compulsory ones." *Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011, 1017 (9th Cir. 2016). And any "perceived inequity of permitting the Tribe to recover from a non-Indian for civil wrongs in instances where a non-Indian allegedly may not recover against the Tribe simply must be accepted in view of the overriding federal and tribal interests in these circumstances." *Three Affiliated Tribes v. World Eng'g*, 476 U.S. 877, 893 (1986).

The Tribes and the Defendants primarily want the same thing—a declaration of title—in regard to the same land. By initiating suit the Tribes gave their "unequivocal consent" to resolution of the issue of title raised in their Complaint. *Quinault*, 868 F.3d at 1098. However, they did not expressly consent to counterclaims. *Id.*; *see also Rupp v. Omaha Indian Tribe*, 45 F.3d 1241 (8th Cir. 1995) (finding waiver when a tribe "did not merely file a quiet title action" but also "affirmatively requested the district court to order the defendants to assert any claims in the disputed lands they possessed against the [t]ribe"). This presents a question as to the scope of the Tribes' waiver and whether it encompasses the Defendants' counterclaims.

The filing of the Tribe's Complaint "invites the court to resolve [the] specific issue" of title to the disputed land. *Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011, 1018 (9th Cir. 2016). Any waiver of tribal immunity "may be limited to the issues necessary to decide the action brought by the tribe" and "is not

13

necessarily broad enough to encompass related matters." *McClendon*, 885 F.2d at 630. In this instance, the Court can fully resolve the issue of title without considering the Defendants' counterclaims, and so it must conclude that the Tribes' waiver does not extend to the Defendants' title-based counterclaims.

The Defendants' title-based counterclaims can be equally satisfied by the assertion of defenses to the Tribes' claims; if the Court denies the Tribes' requested relief, it will find that the Tribes do not have exclusive authority over the site of the anticipated road. Again, as relevant here, the County seeks (1) a declaration "that [the Tribes] ha[ve] no right, title, or interest in or to the real property at issue"; and (2) a declaration of quiet title "to all streets, alleys and public reserves located in the Big Arm Townsite reflecting the interests of Lake County and any other parties of interest." (Docs. 39 & 61.) Lundeen has similarly asked for: (1) quiet title "to all streets, alleys, and public reserves located in the Big Arm Townsite reflecting the interests of Lake County and Ms. Lundeen, as well as the public at large." Because the Court can fully "resolve [the] specific issue" of title without considering the Defendant's counterclaims, it agrees with the Tribes that they did not waive sovereign immunity as to the counterclaims. *Bodi*, 832 F.3d at 1018; *see Quinault*, 868 F.3d at 1098 (Even where counterclaim mirrored tribe's claims, "the Nation did not waive its immunity because it did not consent to any counterclaims. . . . The Estate could assert affirmative defenses against the Nation's

14

claims, but it could not bring counterclaims absent waiver of sovereign immunity."). This is particularly true because the County and Lundeen have not specifically alleged that they have title to the land but only that the Tribe does not.

The balance of the Defendants' counterclaims are more easily disposed of. The County has requested: (3) an injunction barring the Tribes from breaching the stipulation; (4) a permanent injunction "enjoining [the Tribes] from trespassing or regulating the use of roads and alleys within the Big Arm Townsite"; and (5) "[s]uch other relief is just and proper." (Docs. 39 & 61.) Lundeen seeks: (2) an injunction barring the Tribes "during the pendency of this case from restricting access to her property over and through the streets alleys, and public reserves located in the Big Arm Townsite"; (3) an order that the Tribes "immediately remove the locked gate placed on E Street and refrain from erecting any other obstruction or otherwise obstructing public access or person's access to their property or homes"; and (4) "[s]uch other relief as this Honorable Court deems just and proper." (Doc. 16.) Setting aside the issue of mootness arising from the parties' stipulation, the Tribes have not "unequivocally expressed" a waiver of tribal immunity as to these claims for relief. *Santa Clara Pueblo*, 436 U.S. at 58.

The Court notes that this Order will have no significant effect on this litigation. Nothing in this Order restricts the arguments that the Defendants may present to support their defenses to the Tribes' quiet title action. The Court takes

no views on the merits of those defenses, and the Defendants may present the legal theories used to support their counterclaims to dispute the Tribes' claim to tile.

Accordingly, IT IS ORDERED that the Plaintiffs Confederated Salish and Kootenai Tribes' Motion to Dismiss Lake County's Amended Counterclaim (Doc. 51) is GRANTED.

IT IS FURTHER ORDERED that the Plaintiffs' earlier Motion to Dismiss Counterclaims of Lundeen and Lake County (Doc. 32) is GRANTED in part and DENIED in part. The motion is granted as to Defendant Lori Lundeen and denied as moot as to Defendant Lake County.

DATED this 20th day of November, 2019.

Dana L. Christensen, Chief District Judge
United States District Court