IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CONFEDERATED SALISH AND KOOTENAI TRIBES, | CV 19–90–M–DLC |
| Plaintiff, | NUNC PRO TUNC ORDER |
| vs. | |
| LAKE COUNTY BOARD OF COMMISSIONERS; and LORI LUNDEEN, | |
| Defendants. | |

Before the Court are the parties' cross-motions for summary judgment. (Docs. 71 & 87.)  The Court grants the motion of Plaintiff Confederated Salish and Kootenai Tribes and denies the joint motion of Defendants Lake County Board of Commissioners ("Lake County") and Lori Lundeen.

**HISTORICAL BACKGROUND**[1]

## I.      The Creation of the Flathead Indian Reservation

---

[1] The Court considers the information presented in the report of the Plaintiff's expert, historian Ian Smith, to the degree that it is undisputed.  Lake County and Lundeen did not retain an expert but were granted an extension under Federal Rule of Civil Procedure 56(d) to depose Smith and review the transcript of that deposition.  (Doc. 80.)  They have not broadly objected to the admissibility of Smith's expert report.  To the degree that the Defendants argue that Smith failed to consider evidence, the Court considers both the evidence cited by Smith and that which the Defendants believe refutes Smith's report.

The Confederated Salish and Kootenai Tribes—a federally recognized confederation of the Séliš (Salish), Q'lispé (Kalispell, or Upper Pend d'Oreille), and Ksanka (Kootenai) Tribes—once occupied western Montana and parts of Idaho, Wyoming, and British Columbia.  In 1855, the Tribes ceded to the United States most of their aboriginal lands in Montana and Idaho, reserving for their exclusive use the Flathead Indian Reservation—1,245,000 acres in western Montana.  *See* Hell Gate Treaty of 1855, art. II, July 16, 1855, 12 Stat. 975 ("Commencing at the source of the main branch of the Jocko River; thence along the divide separating the waters flowing into the Bitter Root River from those flowing into the Jocko to a point on Clarke's Fork between the Camash and Horse Prairies; thence northerly to, and along the divide bounding on the west the Flathead River, to a point due west from the point half way in latitude between the northern and southern extremities of the Flathead Lake; thence on a due east course to the divide whence the Crow, the Prune, the So-ni-el-em and the Jocko Rivers take their rise, and thence southerly along said divide to the place of beginning.").

Under the terms of the Hell Gate Treaty, non-Indian settlers could reside within the Reservation's boundaries only with the Tribes' permission.  *Id.*  The Tribes agreed to relinquish their claim to the vast majority of their indigenous territories, allowing "all citizens of the United States to enter upon and occupy as settlers any lands not actually occupied and cultivated by said Indians at this time,

and not included in the [Reservation]." *Id.*  The parties stipulated: "That if necessary for the public convenience roads may be run through the said reservation; and, on the other hand, the right of way with free access from the same to the nearest public highway is secured to them, as also the right in common with citizens of the United States to travel upon all public highways." *Id.* art. III.

The Treaty with the Blackfeet—generally called the Lame Bull Treaty—was also signed in 1855, mere months after the Hell Gate Treaty.  Lame Bull Treaty, preface, Oct. 17, 1855.  Signatories included the United States, through Washington Territory Governor Isaac Stevens, and the

> chiefs, headmen, and delegates of the following nations and tribes of Indians, who occupy, for the purposes of hunting, the territory on the Upper Missouri and Yellowstone Rivers, and who have permanent homes as follows: East of the Rocky Mountains, the Blackfoot Nation, consisting of the Piegan, Blood, Blackfoot, and Gros Ventres tribes of Indians. West of the Rocky Mountains, the Flathead Nation, consisting of the Flathead, Upper Pend d'Oreille, and Kootenay tribes of Indians, and the Nez Percé tribe of Indians.

*Id*.

The Lame Bull Treaty's clear theme is peace among and between the various tribes and the United States.  The Chiefs signing the treaty promised "[p]eace, friendship and amity" with the United States.  *Id.* art. I.  They also agreed to avoid "all hostilities whatsoever, excepting in self-defense," with "all . . . neighboring nations and tribes of Indians."  *Id.* art. II; *see also id.* art. XI ("Nor will they make war upon any other tribes, except in self-defense . . . .").  Critical to the

3

preservation of peace was an agreement regarding the various tribes' access to buffalo hunting grounds. Thus, the treaty lays out in great detail how and where the tribes may hunt. *Id.* art. III–VII, XIV.

Similar to the Hell Gate Treaty, the Lame Bull Treaty includes provisions regarding non-Indians' right to travel through tribal lands. The tribal parties agreed "that citizens of the United States may live in and pass unmolested through the countries respectively occupied and claimed by them" and "that the United States may, within the countries respectively occupied and claimed by them, construct roads of every description." *Id.* art. VII, VIII.

## II.    Allotment

Marked by the passage of the Dawes Act in 1887, federal policy toward Indian tribes shifted toward assimilation in the late 19th century. With the Act, Congress authorized the President to survey and force allotment of tribal lands "whenever in his opinion any reservation or any part thereof of such Indians is advantageous for agricultural and grazing purposes." General Allotment ("Dawes") Act, 49 Cong. Ch. 119, 24 Stat. 388, § 1 (1887). Allotment was first to be made to individual tribal members, and then the executive branch was to negotiate "for the purchase and release" of any unalloted lands "on such terms and conditions as shall be considered just and equitable." *Id.* § 5.

4

The Dawes Act and the practice of allotment served federal assimilationist policy in two primary ways.  First, it forced individual tribal ownership of lands, "on the view that private ownership by individual Indians would better advance their assimilation as self-supporting members of our society and relieve the Federal Government of the need to continue supervision of Indian affairs."  *N. Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 650 n.1 (1976).  And second, it opened up tribal lands to non-Indian settlement, diminishing reservations.  *Solem v. Bartlett*, 465 U.S. 463, 468 (1984) ("[T]he Congresses that passed the surplus land acts anticipated the imminent demise of the reservation and, in fact, passed the acts partially to facilitate the process . . . .").

In the words of Peter Ronan, the contemporary U.S. Indian Agent to the Flathead Agency, members of the Tribes "looke[ed] with suspicion upon" the Dawes Act.  (Doc. 67-1 at 16.)  He added, "A large majority of the Indians of the Flathead reservation [we]re averse to taking land in severalty, as they labor under the impression that the residue will be sold by the Government to white settlers, thus breaking up their reservations and mixing the Indians up promiscuously with the white settlers."  (*Id.*)  Tribal leaders were outspoken in their opposition to surveying, believing that "a 'measurement' of land means a robbery of the Indians."  (*Id.* at 17.)  Both Ronan and his successor, Joseph Carter, thought that

the United States would be wise to avoid making any moves toward allotment.[2]

(*Id.* at 17–18.)

The U.S. government did not drop the matter, however.  In its Indian

appropriations bill of 1896, Congress specifically authorized a commission to

negotiate allotment "[w]ith the Crow and Flathead Indians in the State of Montana

for the cession of portions of their respective reservations."  Indian Appropriations

Act of June 10, 1896, 54 Cong. Ch. 398, 29 Stat. 321, 341.  Although the

commission met with tribal leaders repeatedly from 1897 through 1901, it did not

make headway, meeting continued resistance to any diminishment of the

Reservation.  (Doc. 67-1 at 18.)

Ultimately, it was the law that changed—not the minds of tribal members.

In 1903, the United States Supreme Court decided *Lone Wolf v. Hitchcock*, writing

that Congress's plenary power over tribal lands was not limited by "the strict letter

of a treaty with the Indians."  187 U.S. 553, 565 (1903).  The Court held that a

congressional dispensation of tribal land, even if inconsistent with a treaty's

provisions regarding allotment and dispensation, was "a mere change in the form

of investment of Indian tribal property" and fell within the scope of congressional

---

[2] The Hell Gate Treaty includes an allotment provision, but it anticipates only allotment "to such individuals or families of the [Tribes] as are willing to avail themselves of the privilege."  Hell Gate Treaty art. VI.

power.  *Id.* at 568.  Thus, there was no longer a need for a negotiated agreement with the Tribes.

Just over a year after the *Lone Wolf* decision, Congress passed the Flathead Allotment Act, authorizing the executive branch to survey and allot lands within the Reservation.  It appears that an earlier draft of the Act included a tribal consent provision, but it was removed prior to passage.  Then-Secretary of the Interior Ethan Hitchcock wrote to Congress that "[t]he bill if amended [to remove requirement of tribal consent] will fully safeguard and protect the rights and interests of the Flathead Indians, and there is no occasion for presenting the matter to the Indians for the purpose of procuring their consent thereto."   (Doc. 67-1 at 19.)

The Flathead Allotment Act directed the Secretary of Interior to survey the entirety of the Reservation.  Flathead Allotment Act, 58 Cong. Ch. 1495, 33 Stat. 302.  Following the survey, the Secretary was to first force allotment to all individual tribal members and then to classify and make available for sale the unallotted lands to U.S. citizens.  *Id.* §§ 3–9.  The Act provided that the United States was to act as trustee for the Tribes "to dispose of [Reservation] lands and to expend and pay over the proceeds received from the sale thereof."  *Id.* § 16.  However, "nothing in th[e] Act . . . in any manner [bound] the United States to

purchase any portion of the land," except for certain tracts designated for certain organizations. *Id.*

Congress amended the Flathead Allotment Act in its 1906 Indian appropriations bill to provide for the platting and dispensation of townsites on the Flathead Reservation. Indian Appropriations Act of June 21, 1906, 59 Cong. Ch. 3504, 34 Stat. 325 at 354. The appropriations rider named specific preexisting settlements on the Reservation and further authorized the Secretary of the Interior to locate additional "necessary and convenient" townsites. The Secretary was to then "survey, lay out, and plat" the selected sites "into town lots, streets, alleys, and parks." *Id.*

Big Arm, a lakeside settlement with an estimated population of 200 to 300 people in the early 20th Century, was identified as one such "necessary and convenient" site. (Doc. 67-1 at 26.) In 1910, the Interior Department approved the withdrawal of the Big Arm townsite from the Reservation. (*Id.* at 25.) At that time, Big Arm was reported to contain a general store, post office, repair shop, and two office buildings, as well as several abandoned buildings, suggesting that settlers were starting to move away. (*Id.* at 29.)

The site was platted in 1913.  *See* App. A.[3]  The townsite was divided into fifty-one blocks comprising 732 individual lots, which were offered for sale at or above the statutory minimum price of $10 per lot.  App. A  (Doc. 67-1 at 29–30.)  In total, forty-four individuals bought lots, with 128 lots patented before 1920, seven more between 1922 and 1927, and 16 between 1941 and 1953.  App. B (Doc. 67-1 at 30–31.)

### III.   Restoration[4] of Tribal Lands

Approximately 75% of the lots in Big Arm never sold.  (Doc. 67-1 at 30–31.)  By the late 1920s, federal officials were beginning to rethink the Big Arm settlement.  Following a discussion with postmaster and general store owner O.A. Knox, Flathead Agency Superintendent Charles Coe informed the Commissioner of Indian Affairs:

> I might add that Big Arm is almost deserted.  O.A. Knox has a general merchandise store, there is one small Indian Curio shop and a Dance Hall.  The elevator and Hotel has been closed for several years and nearly all the residents have moved away and the homes are nearly all deserted.

(*Id.* at 37.)

---

[3] Attached to this Order are four appendices showing the townsite as platted in 1913 (Appendix A) and the progression of ownership as lots were first sold (Appendix B) and then later restored to the Tribes (Appendices C & D).

[4] As the Tribes have pointed out, the term "restore" is something of a misnomer in the present application because the United States, acting as trustee for the Tribes, retained title in the unpurchased lands.  *See infra* pp. 15–18.  (*See also* Doc. 73 at 4.)  It would be more accurate to refer to the withdrawal of lots from the townsite, as the townsite was itself a proposed diminishment of tribal lands.  However, while "restore" may be technically inaccurate, it is far less clumsy and more easily understood.

Nonetheless, for a short period, the United States redoubled its efforts to sell the lots in Big Arm, this time at the statutory minimum value of $10 per lot.  (*Id.* at 37–38.)  Highway 93, which today connects Arizona to the Canadian border, was soon to be constructed through the townsite, and Coe believed that "property owners [we]re anxious to ac[q]uire holdings on this new highway."  (*Id.* at 38.)

However, upon reappraisal of the townsite, Coe determined that the statutory minimum price of $10 per lot was "entirely too high," given that grazing lands in the area could be purchased for $5 to $10 per acre.  (*Id.* at 38.)  Because "[t]here [wa]s no immediate possibility that Big Arm will become a town of any importance," Coe believed that the United States should restore the south 80 acres of the townsite—no part of which had ever been sold—to the Tribe.  (*Id.* at 38.)  That recommendation was quickly approved, and Blocks 31 through 51 were removed from the townsite.  *See* App. C.  (Doc. 67-1 at 39.)

While ostensibly driven by the market, the move away from selling "surplus lands" in Big Arm was also consistent with a shift in federal policy.  Under the Indian Reorganization Act of 1934, Congress halted the policy of allotment and authorized the Secretary of the Interior "to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or

by any of the public-land laws of the United States."  Indian Reorganization Act, 73 Cong. Ch. 576, 48 Stat. 984 § 3 (June 18, 1934).

Even so, the return of unsold lots in Big Arm to tribal control happened slowly.  For the next two decades, the Tribes worked mightily to restore unsold lands to tribal ownership, facing opposition from the federal government despite non-Indians' historical disinterest in Big Arm.  (Doc. 67-1 at 39–42.)  The Interior Department finally agreed to the restoration of "surplus lands" in Big Arm in 1956, issuing a restoration order returning to the Tribes the remaining 260 unsold lots for which there was "no public demand" and making them "part of the existing reservation, subject to any valid existing rights."  Order Restoring Lands to Tribal Ownership of Confederated Salish & Kootenai Tribes of the Flathead Indian Tribes, 21 Fed. Reg. 6681–82 (Sept. 3, 1956); *see* App. D.

### IV.   Big Arm Today

Despite its location on the southwest shore of Flathead Lake near Wild Horse Island, Big Arm did not become the town anticipated in 1913.  Today, the loose, rural settlement includes a smattering of lakefront and agricultural properties, as well as a lakeside resort operated by the Tribes.  The vast majority of land within the former townsite is owned by the Tribe, with small patches of non-Indian-owned parcels clustered near Flathead Lake.  *See* App. D.

Highway 93 runs through Big Arm, skirting the shoreline of Flathead Lake. It is the only major road in the settlement.  Barely a handful of the roads platted in 1913 came into existence, and those roads diverge considerably from the paths pictured on the map.  In a 1981 Lake County road map, no county roads are depicted in Big Arm, but the map does show a county road over adjacent land, which terminates abruptly at the edge of the platted townsite.  (Doc. 67-17.) Today, the Tribes perform maintenance on the few roads in the settlement and provide water to residents and businesses in the area, regardless of tribal membership status.  (Docs. 68 at 5; 69 at 3).

FACTUAL BACKGROUND

Defendant Lori Lundeen owns 40 acres of land bordering the western boundary of the former Big Arm townsite, which she hopes to develop as an RV park.  With the blessing of the Lake County Board of Commissioners, Lundeen began construction on a road through Big Arm, connecting an existing gravel road, Seventh Street, with her property.  According to the parties at the preliminary pretrial hearing, she has asserted that an alternate route to her property from a private road outside of the Big Arm townsite, Walking Horse, Lane, is financially infeasible.

Lundeen's road follows the rough contours of E Street as it was platted in 1913.  *See* App. A.  On the plat, E Street borders Blocks 17 and 30 of Big Arm.

Block 17 is the site of the former Big Arm school, patented to Flathead County in 1918.[5]  (Doc. 67-1 at 33.)  None of the lots in Block 18 were sold, and so the entire block was restored to the Tribes in 1956.  *See* App. D.

Lundeen applied to the County for a permit.  (Doc. 43 at 4.)  At the hearing on the cross-motions for summary judgment, she informed the Court that she did not, for some inexplicable reason, apply to or otherwise attempt communication with the Tribes.  Although the Tribal representative to the Lake County Board of Commissioners raised concerns to the Board and to Lundeen about access to the proposed RV park through Big Arm, the Board issued its conditional approval of the Wild Horse RV Resort Subdivision on May 16, 2018.[6]  (Doc. 43 at 5.)  Lundeen began advertising for the RV park and commenced construction of the road shortly thereafter.

On May 13, 2019, the Tribes placed a gate blocking access to Lundeen's lot from Seventh Street.   The Bureau of Indian Affairs issued a notice of trespass to Sandry Construction, the contractor Lundeen hired to develop the property.  (Doc. 1-15.)  The Tribes brought this action soon after, and the Defendants counterclaimed.  The Court dismissed the Defendants' counterclaims on November

---

[5] The school closed in 1952, but the one-room schoolhouse building still stands.
[6] Lundeen filed a motion in limine to preclude evidence of the conditional approval letter.  (Doc. 105.)  The letter's provision discussing access is highly unusual, as discussed during the summary judgment hearing.  That said, the Court does not rely on the letter in this Order, and because this Order is dispositive, the motion will be denied as moot.

20, 2019.  The parties have stipulated to the removal of the gate and a halt on road construction pending disposition.  (Doc. 35-2.)

## LEGAL STANDARD

A court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Here, the parties agree that the dispositive questions are legal, and summary judgment is appropriate.

## DISCUSSION

The Tribes seek declaratory judgment in their favor, "quieting [their] beneficial interest to the real property, including streets, alleys, and public reserves (held in trust by the United States for the benefit of the [Tribes]) in the Big Arm Townsite, and determining that Defendants have no right, title, or interest in or to the real property or any public right of way."  (Doc. 60 at 13.)  Defendants' theory of the case has changed over time.  Initially, in their brief, Lake County and Lundeen argued that the Tribes do not have title to any actual or potential roadways in Big Arm as drawn on the 1913 plat.  Later, at argument, the

14

Defendants shifted their theory to one of easement, contending that Lake County has jurisdiction over the roads in Big Arm, but not title to the land itself.

While both the Tribes and the Defendants ask the Court to rule broadly, the Court is not convinced that its decision must reach the issue of jurisdiction over any roadway save the one block of E Street actually disputed in this litigation. The Court finds that the Tribes are entitled to summary judgment as to the disputed tract of land because title rests with the United States as trustee for the Tribes, and the County does not have jurisdiction over public areas on tribal land. If there was a time when Lake County could develop roads in Big Arm without the Tribes' consent, that time has passed.

## I.    Title Was Not Transferred.

The Tribes' primary argument is that there was no transfer of title to the roadways in Big Arm. In their brief, the Defendants argue that Lake County holds title to the roadways depicted on the 1913 plat—or, at minimum, that the Tribes no longer have title. (Doc. 88 at 1, 6.) As previously stated, at the hearing on the cross-motions for summary judgment, the Defendants' theory shifted away from title to one of easement. However, the Defendants have not expressly abandoned their argument regarding title. Thus, the Court considers whether title is retained by the United States, in trust for the Tribes, or was transferred through the Flathead Allotment Act or the 1906 appropriations bill rider.

There is no question here that, from the time of the Hell Gate Treaty in 1855 through the platting of Big Arm, title was held by the United States in trust for the Tribes. *See, e.g.*, *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 670 (1979). And the United States remained trustee throughout the period of allotment. Indeed, the Flathead Allotment Act expressly provides that "the United States shall act as trustee for said Indians to dispose of said lands and to expend and pay over the proceeds received from the sale thereof only as received." 33 Stat. 302 § 16.

Because the United States had no obligation to sell reservation lands under the Flathead Allotment Act, there could be no transfer of title with the passage of that law. And, of course, the majority of the lots in Big Arm were never sold. If title to the Big Arm roadways had been transferred, then, the transfer must have occurred when the plat was issued in 1913. Indeed, this is the crux of the Defendants' argument—that because Congress authorized the sale of individual lots, it also authorized the dedication of the streets to public use, and such dedication actually occurred when the townsite was planned and platted. (*See* Docs. 88 at 2–6; 92 at 14–16.) They claim that "[t]o hold otherwise [would be] illogical because nobody would purchase a lot in a townsite without access." (Doc. 88 at 20.)

However, tribal lands cannot be divested by implication. "The whole purpose of trust land is the protection of land from unauthorized alienation."

16

*Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269, 1272 (9th Cir. 1991).  Thus, "only Congress," as trustee, "can divest a reservation of its land and diminish its boundaries."  *Solem*, 465 U.S. at 470.  "Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise."  *Id.*

Here, the Flathead Reservation was not diminished by the Flathead Allotment Act or the related 1906 townsite-specific legislation.  In *Solem*, the United States Supreme Court explored the distinction between "those surplus land acts that diminished reservations [and] those acts that simply offered non-Indians the opportunity to purchase land within established reservation boundaries."  *Id.* at 470.  Congress must "clearly evince an 'intent to change boundaries' before diminishment will be found."  *Id.* (quoting *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 616 (1977)).

Although "explicit language of cession and unconditional compensation are not prerequisites for a finding of diminishment," they are the most important factors.  *Id.* at 471.  And neither is found here.  First, the Flathead Allotment Act expressly provides that the United States was to remain in its position as trustee and that it had no obligation to sell the surveyed lands.  Further, compensation was not "unconditional" but instead was tied to the sale of lots; if the lots did not sell,

there was no transfer of land and money.  Congress did not clearly intend to diminish the Reservation, and the creation of the 1913 plat did not, in and of itself, remove the lands from tribal control.

## II.     Lake County Does Not Have Jurisdiction to Unilaterally Construct a New Road in Big Arm.

At the motions hearing, Lake County and Lundeen argued that the County has jurisdiction over the roadways, even if it does not have title.  Their position relies heavily on Department of Interior communications—primarily letters between Interior officials—discussing jurisdiction over roads throughout Indian country.  They contend that the agency materials nearly unanimously demonstrate "the 'general rule of law' that 'approval of a townsite plat by the Secretary of the Interior, in accordance with law and sale of lots thereunder constitutes a dedication to public use of the streets and alleys shown on the plat without the necessity of special words of dedication on the plat.'"  (Doc. 88 at 23 (quoting Doc. 86-11).)  It is true that administrators' "manner in . . . deal[ing] with unallot[t]ed open lands" "has some evidentiary value."  *Solem*, 465 U.S. at 471.  However, here the Defendants' reliance on such materials is misplaced for several reasons.

First, the materials do not constitute factual evidence.  Instead, the officials repeat, often verbatim, the same general legal opinion that a platted street is dedicated to public use, but they give no attribution for that opinion outside of other Interior letters and memoranda.  The Court cannot accept this ipse dixit

simply because it appears to have been popular among many Interior officials in the early and mid-twentieth century.  What is more, some of the statements are plainly incorrect; for example, one letter states that "when an area is platted and recorded, the streets, alleys, and other public use areas . . . are no longer considered property of the United States or subject to the administrative jurisdiction of the Secretary of the Interior."  (Doc. 86-13.)  But we know that this cannot be true in Big Arm because the United States remained as trustee and had no obligation to sell lands under the Flathead Allotment Act.

Second, the record is not, as Lake County and Lundeen suggest, unanimous. For example, the Defendants rely on statements made by Field Solicitor Roy Allan in 1960.  But he also wrote in 1957:  "There is nothing in the [Flathead surplus land acts] by which the Congress has authorized the title in the United States in the streets, road[s], etc., in unincorporated townsites and villa sites on the Flathead reservation to be transferred to anyone."  (Doc. 67-24.)  And that opinion was repeated in various other agency materials throughout the years.  (Docs. 67-25, 67-26.)  Where administrative materials are "rife with contradictions and inconsistencies," they can "be of no help to either side."  *Solem*, 465 U.S. at 470; *see also Nebraska v. Parker*, 136 S. Ct. 1072, 1082 (2016) ("This 'mixed record' of subsequent treatment of the disputed land cannot overcome the statutory text, which is devoid of any language indicative of Congress' intent to diminish.");

*Confederated Salish & Kootenai Tribes v. Namen*, 665 F.2d 951, 959 (9th Cir. 1982) ("Actions and utterances of federal officers that manifest no single clear perception of the Reservation's status can hardly be treated as a significant item in determining that status.")

Third and finally, the materials do not hold the meaning attributed to them by the Defendants.  Even accepting the statements in these communications as true, it is not merely the platting of a townsite that dedicates the roadways to public use but the platting and subsequent sale of lots.  (*See, e.g.*, Docs. 86-11, 86-12.) The officials' approach is functional, tying jurisdiction over public use areas to residents' status as tribal members or non-Indian county residents.  For example, one of the letters that the Defendants rely upon is a 1960 letter directed toward "[r]estoration to tribal ownership of streets, alleys and public reserves" in two other Flathead Reservation townsites.  (Doc. 86-12.)  The author of that letter—like several others submitted by the Defendants—explained that owners of lots adjacent to the roadways must petition under Montana law for the abandonment of the roadways.  (Doc. 86-12; *accord* Doc 86-11, 86-13.)  The Defendants claim that these letters support County jurisdiction over the roadways in Big Arm, but in fact they say only that a county road remains a county road unless and until the appropriate legal procedures are followed to abandon the road.

The opinions in the Defendants' submitted exhibits are indifferent to the precise question here, which is jurisdiction to build a previously undeveloped road through what is today tribal land.  Tellingly, one of the letters includes language (ignored by the Defendants) puzzling through that issue: "Restoration of unused dedicated areas to tribal ownership simultaneous with the restoration of undisposed of lots would, if possible, be desirable."  (Doc. 86-16.)  Another official wrote that "[w]hen [platted roads] are no longer used for [a public purpose], they revert to tribal jurisdiction."  (Doc. 67-26.)  Like the other Interior communications, these documents are not particularly persuasive, but they show that even this relatively weak authority does not support the Defendants' position.

In more practical terms, it hardly makes sense that a hundred-plus-year-old plat, which marks long-abandoned plans and a rightfully discarded assimilationist policy, can give a county the authority to unilaterally approve a new road through tribal land today.  The parties do not discuss extensively the effect of the restoration of most of the lots in Big Arm to tribal ownership.  However, the Court finds the withdrawal of lots from the townsite in 1930 and again in 1956 to be significant.  *See Solem*, 465 U.S. at 472 (considering, "[o]n a more pragmatic level," "who actually moved onto opened reservation lands").

Lake County and Lundeen argue that it defies logic to open up lots for sale to non-Indians but not to authorize local road construction.  The Court does not

necessarily disagree with that sentiment.  Here, though, the Defendants' logic

works against them because the adjacent lots have been restored to tribal control; if

a county has jurisdiction over roads in a non-Indian townsite, then surely the tribal

government is entitled to the same treatment.  In fact, it is highly unlikely that Lake

County truly wants jurisdiction over the roadways in Big Arm to the degree that

jurisdiction brings attendant governmental responsibilities—which, by all

accounts, the tribal government is currently performing.  *See supra* p. 12.  All that

Lake County appears to want is to allow Lundeen to build an access road in the

location most convenient for her business.

   If the Defendants seek to build a road in Big Arm, there is a procedure

through which individuals and state and local governments may petition to develop

roadways through Indian country.  But Lake County and Lundeen did not follow

the procedure in this instance.  "The Secretary of the Interior is authorized to grant

permission, upon compliance with such requirements as he may deem necessary, to

the proper State or local authorities for the opening and establishment of public

highways . . . through any Indian reservation . . . ."  25 U.S.C. § 311.  Today, a state

or local government must submit a thorough application to the Bureau of Indian

Affairs to establish a road under § 311.  *See* 25 C.F.R. § 169.102.  While the

"requirements . . .  deem[ed] necessary" have changed over the years, there is no

dispute here that the United States has not given permission to Lake County and/or

22

Lundeen to construct E Street.  In fact, Lundeen did not even seek permission from the United States or the Tribes.

There may have been a time during which Lake County (or its predecessor, Flathead County) could have developed E Street.  However, assuming that it once had that authority, the County did not develop the roadway during that time.  The question now is whether Lundeen and Lake County can build a road through tribal lands today, without first filing a petition to the United States or even seeking permission from the Tribes.  The relevant statutes, administrative materials, and historical record give a clear answer: No.

### III.   The Hell Gate and Lame Bull treaties do not give the County an unrestricted right to build roads through the Reservation.

Although the determination that Lake County lacks jurisdiction over E Street is dispositive, the Court nonetheless considers the balance of the Defendants' arguments.  Lake County and Lundeen lean heavily on the Hell Gate and Lame Bull Treaties.  The Court assumes without deciding that Lake County and Lundeen may enforce a treaty between two sovereigns.  *See, e.g.*, *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 512–14 (9th Cir. 2005) (en banc) (explaining that, in limited circumstance, treaties "have . . . been found to provide rights of action for equitable relief *against* non-contracting parties" (emphasis added)).  Considering the Defendants' treaty-based arguments on their merits, the Court is not convinced.

As a threshold matter, the Lame Bull Treaty is irrelevant to this question; it was "not a so-called land treaty at all" but "a peace treaty."  William E. Farr, *"When We Were First Paid" The Blackfoot Treaty, the Western Tribes and the Creation of the Common Hunting Ground, 1855*, Great Plains Quarterly 131–154 (Spring 2001).  The Tribes were interested in securing peace with other tribes, particularly the Blackfeet, and preserving access to buffalo hunting grounds outside of the boundaries of the Flathead Reservation.  *See generally id*.; *see also supra* p. 3–4.  Courts must "give effect to the terms [of a treaty] as the Indians themselves would have understood them," and the Tribes surely did not understand the Lame Bull Treaty to be a diminishment of their land rights within the Reservation.  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999).

If the Tribes had given to local governments the right to build roads throughout the Reservation, they would have done so in the Hell Gate Treaty.  The Hell Gate Treaty provides that, "if necessary for the public convenience[,] roads may be run through the said reservation; and, on the other hand, the right of way with free access from the same to the nearest public highway is secured to them, as also the right in common with citizens of the United States to travel upon all public highways."  Hell Gate Treaty art. III.  Lake County and Lundeen claim that this language gives local governments the power to construct roads through the

Reservation whenever the County concludes that a road would be in the public interest.

The Defendants' position is foreclosed by the Treaty itself, which provides that the Reservation "shall be set apart . . . for the exclusive use and benefit of [the Tribes]." *Id.* art. II. The treaty's provision regarding roads cannot be understood to limit tribal sovereignty within the Reservation, as Lake County and Lundeen suggest. "The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of, which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense." *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 582 (opinion of Marshall, J.). "And they must be construed, not according to their technical meaning, but 'in the sense in which they would naturally be understood by the Indians.'" *Carpenter v. Shaw*, 280 U.S. 363, 367 (1930) (quoting *Jones v. Meehan*, 175 U.S. 1, 11 (1899)).[7]

---

[7] It should be noted that the early cases setting forth the rules of treaty interpretation are grounded in paternalistic and racist attitudes toward indigenous peoples. Social, cultural, and linguistic barriers to communication were described in terms of contrast between the "enlightened and powerful" United States and "weak and dependent" tribes. *Jones*, 175 U.S. at 10 (1899); *Choctow Nation v. United States*, 119 U.S. 1, 28 (1886) ("The recognized relation between the parties to this controversy, therefore, is that between a superior and inferior, whereby the latter is placed under the care and control of the former . . . ."); *Worcester v. Georgia*, 31 U.S. 515, 582 (1832) (Marshall, C.J.) (describing the tribes as "savage" and "uncivilized"). However, while these decisions were informed by unsavory historical attitudes, the rules themselves are sound, as they reflect the general rule that contracts are construed against the drafter—and this should be particularly so where the contract is written exclusively in the drafter's own language. *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999); *Antoine v. Washington*, 420 U.S. 194, 199–200 (1975); *United States v.*

The provision regarding roads "is nothing more than a recognition of the public's right of navigation." *Confederated Salish & Kootenai Tribes v. Namen*, 380 F. Supp. 452, 459 (D. Mont. 1974), *adopted as the opinion of the Ninth Circuit Court of Appeals*, 534 F.2d 1376 (mem.).  A public right of travel does not equate to permission to build all desired roads.  Even assuming that the Defendants may enforce the Hell Gate Treaty, the Treaty does not authorize county jurisdiction over roads.  It does not nullify 25 U.S.C. § 311, which sets forth the procedures by which a local government may request permission to construct a road through tribal lands held in trust by the United States.

## IV.   The Tribes' win in a 1971 Court of Claims case does not foreclose this litigation.

Lake County and Lundeen next argue that the Tribes cannot prevent their construction of E Street because the Tribes were previously compensated for the Big Arm townsite in a 1971 Court of Claims lawsuit.  In 1946, Congress "conferr[ed] jurisdiction upon the Court of Claims to hear, examine, adjudicate, and render judgment in any and all claims which the Confederated Salish and Kootenai Tribes . . . may have against the United States . . . ."  Special Jurisdictional Act, 79 Cong. Ch. 701, 60 Stat. 715 § 1 (July 30, 1946).  The Tribes brought a "many-sided suit" under that act, one part of which was a takings claim

---

*Washington*, 827 F.3d 836, 850–51 (9th Cir. 2016); *Wash. State Dep't of Licensing v. Cougar Den., Inc.*, 139 S. Ct. 1000, 1016 (2019) (Gorsuch, J., concurring).

arising from the Flathead Allotment Act. *Confederated Salish & Kootenai Tribes of Flathead Reservation v. United States*, 437 F.2d 458, 459 (1971) (per curium). The Court of Claims adopted the findings and recommendations of a trial commissioner, awarding $6,066,668.78 to the Tribes on the grounds that the forced allotment and sale of tribal lands "was inconsistent with a good faith effort to give the Indians the full money value of their land" and therefore "an eminent domain taking necessarily resulted." *Id.*

The trial commissioner based his findings on a report jointly authored by two land record experts, Georgette B. Lee for the Tribes and John T. Kenney for the United States. Lee and Kenney determined that the United States had taken 485,171.31 acres of Reservation land, 126.66 acres of which made up the Big Arm townsite. (Doc. 88-1.) Given that the 1914 plat comprised 206.66 acres and that 80 acres were restored to the Tribes in 1930,[8] it is not difficult to see how Lee and Kenney reached this number. And it is true, as Lake County and Lundeen argue, that the compensation awarded in the Court of Claims case included payment for these 126.66 acres.

That said, the legal significance of the Court of Claims decision is hotly disputed. Lake County and Lundeen argue that the opinion is dispositive of the

---

[8] Lake County and Lundeen state that they "do not concede that this 80 acres was properly eliminated from the Big Arm townsite." (Doc. 88 at 11 n.3.) It is unclear how the Defendants' position is furthered by their refusal to concede this point.

present controversy under any or all of three theories: (1) preclusion; (2) estoppel; and (3) payment or accord and satisfaction.  The Court disagrees on all counts.

### A. The preclusion doctrines do not apply.

Lake County and Lundeen argue that the Tribes cannot succeed under the preclusion doctrines, which grow out of the "fundamental precept . . . that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties or their privies.'"  *Montana v. United States*, 440 U.S. 147, 153 (1979) (quoting *S. Pac. R. Co. v. United States*, 168 U.S. 1, 48–49 (1897)).  Claim preclusion bars relitigation of suits that have been or could have been decided in a prior lawsuit.  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003).  Issue preclusion prevents relitigation of specific issues.  *Janjua v. Neufeld*, 933 F.3d 1061, 1065 (9th Cir. 2019).  Neither doctrine is in play here.

#### 1. Claim Preclusion

The claim preclusion doctrine applies "whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties."  *Stratosphere Litig. LLC v. Grand Casinos, Inc.*, 298 F.3d 1137, 1142 n.3 (9th Cir. 2002).  Here, the first element is not met.  There is no "identity of claims."  The Tribes could not have brought the present action in the Court of Claims lawsuit.

"To determine whether successive lawsuits involve the same cause of action, [courts] consider: (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts." *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992).

None of the factors outlined in *Clark* are satisfied here. First, the "prosecution of the present action" would have no bearing on the issue decided in the 1971 case. A decision that Lake County lacks jurisdiction over the roads in Big Arm would not mean that no taking occurred. Second, the "same evidence" is not involved, unless "evidence" can be understood as synonymous with interpretations of land records and legal history. Third, the Tribes' right to enforce its treaties with the United States and to hold the United States accountable for breaching its obligations under the federal constitution is not akin to its right to prevent a local government and private landowner from taking Reservation lands to advance their own pecuniary interests. Fourth and finally, the "same transactional nucleus of facts" do not give rise to both suits, unless—similarly to the second factor—one construes "facts" to comprise policy, law, and over 150 years of historical data. The present action arises from specific facts related to Lake County and Lundeen's

29

attempt to build a road in Big Arm.  The claims are not sufficiently related or similar, and the claim preclusion doctrine does not apply.

### 2.  Issue Preclusion

"To foreclose relitigation of an issue: (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action."  *Clark*, 966 F.2d at 1320.  Here, there is no identity of issues, and therefore there is no preclusion.

The Court of Claims decision has no bearing on jurisdiction over platted but unbuilt roads in Big Arm.  Lake County and Lundeen argue only that the County has jurisdiction over roadways such that it may build a road in a location convenient for Lundeen.  However, if the Court of Claims actually decided anything regarding present ownership of Big Arm, it would be that the Tribes have no ownership interest in the north 126.66 acres of the platted townsite.  And no one suggests that this occurred; that would be patently unfair as well as in conflict with the restoration of 260 lots—including those adjacent to E Street—in 1956.  It would be absurd to argue that, because the Tribes received payment in 1971 for the taking of those lots, they had not been restored to the Tribes in 1956.  At most, the Tribes were overcompensated by the Court of Claims.  However, that court was

attempting rough justice for decades of federal policy regarding hundreds of

thousands of acres of tribal land, and the 126.66 acres in Big Arm may not have

been closely scrutinized—and understandably so.

### B. The Tribes are not estopped from litigating this matter.

Lake County and Lundeen next argue that the Tribes are estopped from

bringing the current suit because of their success before the Court of Claims.

The doctrine of judicial estoppel prevents a party from asserting a claim in a legal

proceeding that is inconsistent with a claim taken by that party in a previous

proceeding." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting 18

Moore's Federal Practice § 134.30, 134–62 (3d ed. 2000)).  "[S]everal factors

typically inform the decision whether to apply the doctrine in a particular case": (1)

"clear[] inconsisten[cy]" between positions; (2) the threat of "creat[ing] the

perception that either the first or the second court was misled"; and (3) fairness to

the parties.  *Id.* at 750–51.

None of the factors counsel in favor of estoppel.  First, as discussed above,

the issues in this case and the Court of Claims case are not the same.  Thus, the

Tribes' position on the issues in each case cannot readily be compared to each

other.  The Tribes did not address jurisdiction over roadways before the Court of

Claims, and therefore the present case does not create an opportunity for

inconsistency.  Indeed, the Tribes' position in each case is the same when stated as

a broad principle—they assert tribal sovereignty and seek to exercise their authority over the relatively small portion of their aboriginal homelands reserved in the Hell Gate Treaty of 1855.  Second, because the Court of Claims did not address the issue of jurisdiction over roads, this Court's decision cannot create inconsistency.  Third, Lake County was not a party to the Court of Claims case, and there is no indication that it relied on that case when it authorized Lundeen's project.  Moreover, given the lack of identity between the Tribes' litigation positions, any reliance would not be reasonable.  Accordingly, the Court disagrees that it is unfair to allow the Tribes' claims to proceed.

### C. Neither payment nor accord and satisfaction apply.

Finally, Lake County and Lundeen argue that the contract principles of payment and accord and satisfaction entitle them to summary judgment.  Because these defenses are relevant only in contract law, neither theory may succeed for two foundational reasons.  First, here there are no claims sounding in contract.  And second, even if there were, there was no contract between the Tribes and the Defendants, rendering the Defendants' contract-based theories wholly inapplicable.

Citing a case from the District of Delaware Bankruptcy Court, the Defendants argue that the Tribes have no claim to the platted E Street because "[p]ayment discharges a liability."  (Doc. 88 at 15 (citing *In re LTC Holdings, Inc.*, 597 B.R. 565, 576 (Bankr. D. Del. 2019)).)  But, even assuming the applicability of

a payment theory, a discharge of the United States's liability to the Tribes does not affect whether Lake County and Lundeen have jurisdiction over roads in Big Arm.

The Defendants' theory of accord and satisfaction fares no better. They argue that "[b]y accepting the payment sought in its lawsuit, [the Tribes] deemed the claim satisfied." (Doc. 88 at 16.) Again, the "claim" at issue in the 1971 Court of Claims case is not being relitigated. Lake County and Lundeen's contract theories are inapplicable. The Tribes are entitled to summary judgment, and the Defendants do not have jurisdiction to develop E Street.

Accordingly, IT IS ORDERED that Plaintiff Confederated Salish and Kootenai Tribes' Motion for Summary Judgment (Doc. 71) is GRANTED. The Joint Motion for Summary Judgment of Defendants Lake County Board of Commissioners and Lori Lundeen (Doc. 87) is DENIED.

IT IS FURTHER ORDERED that Lundeen's Motion in Limine re: Conditional Approval Letter (Doc. 105) is DENIED as moot.

DATED this 16th day of April, 2020.

Dana L. Christensen, District Judge
United States District Court